UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAIN IRRIGATION, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NETAFIM IRRIGATION, INC.,<br><br>Defendant. | No. 1:18-cv-01311-DAD-BAM<br><br>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND<br><br>(Doc. No. 18) |

This matter is before the court on defendant Netafim Irrigation, Inc.'s motion to dismiss the first amended complaint. (Doc. No. 18.) On May 7, 2019, that motion came before the court for hearing. Attorney A. Peter Rausch, Jr. appeared on behalf of plaintiffs Jain Irrigation, Inc. ("Jain"), Agri-Valley Irrigation ("AVI"), and Irrigation Design & Construction LLC ("IDC"). Attorneys Kendall H. MacVey and Kenneth Reinker appeared on behalf of defendant. Having considered the parties' briefing, and for the reasons that follow, defendant's motion will be granted with leave to amend.

**BACKGROUND**

In the first amended complaint, plaintiffs allege as follows. Jain manufactures and sells a wide variety of drip and micro-irrigation equipment throughout the United States, and as of 2017 has sales of approximately $80,000,000.00. (Doc. No. 14 ("FAC") at ¶ 10.) IDC is in the

1

business of designing, engineering, fabricating, installing, and maintaining agricultural irrigation systems and selling irrigation supplies and parts at seven retail locations serving the Central and Salinas Valleys of California. (*Id.* at ¶ 11.) AVI does similar work throughout the Central Valley. (*Id.* at ¶ 12.) Like Jain, defendant Netafim also manufactures and sells drip and micro-irrigation products. (*Id.* at ¶ 14.)

On or about April 19, 2017, IDC and AVI announced that they had each entered into an agreement to provide equity to a newly formed company, Jain Distribution Holdings, Inc. ("Jain Distribution"), funded by Jain. (*Id.* at ¶ 13.) Although Jain Distribution became an investor and part owner of AVI and IDC, each continued to be managed and operated as an independent distributor. (*Id.*) Beginning that same month, plaintiffs allege that Netafim began to form and enter into a conspiracy with other companies to boycott IDC and AVI. (*Id.* at ¶ 28.) These companies include, but are not limited to, Rivulis Irrigation, Inc. ("Rivulis"), Eurodrip U.S.A., Inc. ("Eurodrip"), The Toro Company ("Toro"), Bowsmith, Inc. ("Bowsmith"), Rain Bird Corporation ("Rain Bird"), Landmark Irrigation, Inc. ("Landmark"), and Hydratec, Inc. ("Hydratec"). (*Id.* at ¶¶ 15–22, 28.) In furtherance of the conspiracy, each of these companies (collectively, the "Conspiring Manufacturers") terminated their prior business relationships with IDC and AVI and refused to supply any further products to either company. (*Id.* at ¶ 28.) That same month, and pursuant to the same conspiracy, the Conspiring Manufacturers agreed with an unknown number of distributors (including at least Landmark and Hydratec) that in exchange for the Conspiring Manufacturers' agreement to boycott AVI and IDC, the distributors would boycott Jain by reducing or terminating their purchases of Jain products. (*Id.* at ¶ 29.)

The FAC describes Netafim as the "instigator" of the conspiracy and alleges that it sought to recruit other manufacturers to join. (*Id.* at ¶ 30.) The FAC also alleges that following the announcement of Jain Distribution's formation, Netafim's president telephoned an executive of Fresno Valve & Casting ("Fresno Valve"), a manufacturer of irrigation equipment and a direct competitor of both Netafim and Jain, and stated in substance that Jain "broke the rule" prohibiting manufacturers from selling directly to growers. (*Id.*) The Netafim president then asked Fresno Valve to join Netafim to stop the violation of this "rule." (*Id.*) Fresno Valve did not agree to

2

join, and after speaking to executives at AVI and IDC confirming their intention and ability to continue to act independently, Fresno Valve's executive advised that Fresno Valve would not cut off sales to them. (*Id.*) A few days after that phone call, Netafim publicly announced that it was terminating its relationship with IDC and AVI. (*Id.* at ¶ 31.) In May and June 2017, Rivulis, Toro, Rain Bird, and Bowsmith took similar action. (*Id.* at ¶¶ 32–35.)

Although Fresno Valve did not join the boycott of AVI and IDC, it remained under significant pressure to do so. (*Id.* at ¶ 36.) The FAC alleges that various distributors had direct discussions with Fresno Valve executives, stating in substance that "you are either with us or against us." (*Id.*) Representatives from Bowsmith visited Fresno Valve and suggested to their executives that it would be better to cut off AVI and IDC. (*Id.* at ¶ 37.) The FAC further alleges that there was particular pressure on Fresno Valve because it was virtually the only source of filters for AVI and IDC. (*Id.* at ¶ 36.) Thus, if Fresno Valve could be persuaded to join the boycott, it would effectively "cripple" AVI and IDC. (*Id.*)

The FAC also describes an incident in which AVI and Rivulis representatives met over lunch to discuss the boycott. The Rivulis representative revealed that although Rivulis had projected a loss of 20% of its business due to the boycott, it turned out that the boycott had caused much greater losses. (*Id.* at ¶ 42.) The Rivulis representative went on to state that "Netafim started this whole thing" and was the "ring leader" of the arrangement. (*Id.*) The representative further stated that Netafim had asked Rivulis to "join them in cutting off Jain" for the purpose of hurting Jain because Jain had "crossed the line" by getting into the distribution market, that Netafim had been calling other "suppliers" and asking them not to sell to AVI or IDC, and that Netafim and Rivulis intended to cost AVI and IDC business. (*Id.*)

In August 2017, Netafim brought several distributors in California to a meeting in Washington State. (*Id.* at ¶ 43.) At the meeting, the distributors discussed strategies to "take out" AVI and IDC and agreed that they should work together to damage AVI and IDC. (*Id.*) The FAC lists numerous companies who had representatives present at this meeting. Ultimately, as a result of the conspiracy, or by reason of threats or pressure from the Conspiring Manufacturers, numerous companies have either reduced or eliminated their purchases from Jain. (*Id.* at ¶ 50.)

Plaintiffs seek both damages and injunctive relief under the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, California Business and Professions Code §§ 16720 and 16726. In addition, plaintiffs assert that defendants have interfered with prospective economic relations. Defendant moved to dismiss the FAC on February 6, 2019. (Doc. No. 18.) On March 19, 2019, plaintiffs filed an opposition. (Doc. No. 23.) Defendant filed a reply on April 2, 2019. (Doc. No. 24.)

**LEGAL STANDARD**

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). However, the court need not assume the truth of legal conclusions cast in the form of factual allegations. *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws

in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

**ANALYSIS**

**A.     Sherman Act and Cartwright Act Claims**

Plaintiffs' federal antitrust claims are brought pursuant to § 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1; *see also United States v. Joyce*, 895 F.3d 673, 676 (9th Cir. 2018) (noting that despite the seemingly broad language of this provision, courts have construed § 1 of the Sherman Act as prohibiting only agreements that *unreasonably* restrain trade) (citations omitted). To state a claim under that provision, a plaintiff must

> plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition.

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

Broadly speaking, courts analyze such claims in two ways depending on the nature of the violation alleged. "Typically, the determination of whether a particular agreement in restraint of trade is unreasonable involves a factual inquiry commonly known as the 'rule of reason.'" *Joyce*, 895 F.3d at 676. The rule of reason "weighs legitimate justifications for a restraint against any anticompetitive effects." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003); *see also Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) (stating that in determining whether a particular agreement is permissible under the rule of reason, a court "must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable").

"The rule of reason inquiry, however, is inapplicable if 'the restraint falls into a category of agreements which have been determined to be per se illegal.'" *Joyce*, 895 F.3d at 676 (quoting *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991)). The per se rule, which "treat[s]

categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (noting that "per se rules are appropriate only for conduct that is manifestly anticompetitive, that is, conduct that would always or almost always tend to restrict competition and decrease output") (internal quotation marks and citation omitted). *But see NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.26 (1984) ("There is often no bright line separating per se from Rule of Reason analysis. Per se rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct."). The types of agreements or practices recognized by courts as per se unlawful include "horizontal price fixing, division of markets, group boycotts, tying arrangements, and output limitations." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996). When a per se violation of § 1 of the Sherman Act is at issue, courts "do not require evidence of any actual effects on competition because [the] the potential for harm [is] so clear and so great." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1410 (9th Cir. 1991); *accord In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1206 (N.D. Cal. 2005) (holding that in a per se case, "plaintiffs need not plead a relevant market (as they would need to do for a section 2 claim), nor do they need to plead the harm to competition, something which is presumed in a per se case").

The inquiry under the Cartwright Act is similar. The Cartwright Act is California's antitrust law, and the analysis under that statute "mirrors the analysis under Federal Law because the Cartwright Act . . . was modeled after the Sherman Act." *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (citing Cal. Bus. & Prof. Code § 16700 *et seq.*).

As stated, whether to utilize a per se analysis or the rule of reason depends on the type of conspiracy alleged. To be sure, some courts have held that the decision of "whether per se or rule of reason analysis applies . . . is more appropriate on a motion for summary judgment." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012). Here, however, plaintiffs specifically assert their antitrust claims exclusively on a per se theory of liability. (*See*

FAC at ¶ 6 n.1.)  The court will respect plaintiffs' decision and therefore confines its analysis to the question of whether the FAC adequately alleges a per se violation of the Sherman Act. *See Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 994 (N.D. Cal. 2015) (declining to analyze the complaint on a per se theory because "[p]laintiffs' Complaint expressly states that 'Defendants' arrangements are unlawful under the antitrust laws when assessed under the Rule of Reason'"); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013) ("A plaintiff is the master of its complaint and may choose which claims to allege."); *cf. Northshore Sheet Metal, Inc. v. Sheet Metal Workers Int'l Ass'n, Local 66*, No. 15-CV-1349 BJR, 2018 WL 4566049, at *4 (W.D. Wash. Sept. 24, 2018) (noting that "[i]t is . . . favorable to a plaintiff to allege a *per se* restraint to avoid the more searching analysis and economic impact requirements of the rule of reason standard").  Plaintiffs' opposition to the pending motion to dismiss fleshes out this theory and describes the alleged conspiracy as of the "hub and spoke" variety, in which Netafim and the Conspiring Manufacturers are the hub, the distributors are the spokes, and the rim is the agreement among the distributors to (a) refuse to make purchases from Jain and (b) to prevent AVI and IDC from obtaining the products of the Conspiring Manufacturers.  (Doc. No. 23 at 21 n.3.)

The Ninth Circuit's approach to hub and spoke conspiracies was first discussed in *In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186, 1192 (9th Cir. 2015). Notably, for present purposes, the Ninth Circuit recognized that hub-and-spoke conspiracies frequently involve horizontal agreements among competitors (which are generally subject to per se scrutiny) as well as vertical agreements between firms at different levels of a supply chain (which are generally subject to a rule of reason analysis). *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1191–92 ("One conspiracy can involve both direct competitors and actors up and down the supply chain, and hence consist of both horizontal and vertical agreements.").  Where a hub-and-spoke conspiracy involves both horizontal and vertical agreements, "the conspiracy is broken into its constituent parts," with the horizontal agreements analyzed under the per se rule and vertical agreements analyzed under the rule of reason. *Id.* at 1192; *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) ("[P]recedent limits the

*per se* rule in the boycott context to cases involving horizontal agreements among direct competitors."); *In re NFL Sunday Ticket Antitrust Litig.*, No. ML 15-02668-BRO(JEMx), 2017 WL 3084276, at *8 (C.D. Cal. June 30, 2017) ("[T]he Ninth Circuit has instructed that where there are multiple agreements involved, the court is to analyze each separately."); *G.U.E. Tech, LLC v. Panasonic Avionics Corp.*, No. SACV 15-00789-CJC(DFMx), 2016 WL 6138422, at *3 (C.D. Cal. Feb. 4, 2016) ("Vertical refusals to deal—for example, between a manufacturer and a retailer—do not per se violate the Sherman Act and are instead subject to the 'rule of reason,' which examines an agreement for its anticompetitive effects.").

As applied here, this line of cases presents a quandary. On one hand, the structure of the conspiracy alleged appears quite similar to that in *In re Musical Instruments* since it involves both horizontal agreements between manufacturers (such as Netafim and Rivulis) and vertical agreements between manufacturers and distributors (such as Netafim and RDO). (FAC at ¶¶ 40, 42.) The proper approach under the decision in *In re Musical Instruments* would appear to be to analyze the horizontal agreements using a per se approach, and the vertical agreements under the rule of reason. On the other hand, plaintiffs in this case are explicit in their briefing that the entire conspiracy as alleged "is per se unlawful," (Doc. No. 23 at 23), and the FAC makes clear that plaintiffs are specifically alleging a per se violation of the Sherman Act. (FAC at ¶ 6 n.1.)

Based on the precedent discussed above, the court finds that the conspiracy alleged by plaintiffs, even if proven, does not amount to a per se violation of § 1 of the Sherman Act. Plaintiffs' theory of the case is that as part of the conspiracy, "the Conspiring Manufacturers agreed with an unknown number of dealer/distributors . . . that, in exchange for the Conspiring Manufacturers' agreement to boycott AVI and IDC, such dealer/distributors would engage in a group boycott or collective refusal to deal with Jain[.]" (FAC at ¶ 29.) Thus, the conspiracy alleged is premised upon vertical agreements between manufacturers and distributors, in which the manufacturers agree to boycott AVI and IDC in return for the distributors agreeing to boycott Jain.

At oral argument, plaintiffs for the first time advanced a new argument—namely, that rather than one single conspiracy, the FAC in fact alleges two entirely separate conspiracies. In

8

this telling, the FAC alleges one horizontal conspiracy among manufacturers, and a second horizontal conspiracy among distributors, with some nebulous, unspecified connection running between them. This argument is belied by the FAC itself and the allegations therein which repeatedly refers to a single conspiracy. (*See, e.g.*, FAC at ¶¶ 30, 32–34, 36–38.) The court is bound to accept the factual allegations of the FAC as true for purposes of resolving the pending motion.

Moreover, the law is clear that vertical agreements involving boycotts must be analyzed under the rule of reason. *See NYNEX Corp.*, 525 U.S. at 135; *Calculators Haw., Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1337 n.2 (9th Cir. 1983) ("The district court properly found *per se* analysis inappropriate because Brandt and Hallett were not competitors. Any 'group boycott' therefore consisted of a vertical agreement, to which the rule of reason applies."); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1357 (N.D. Cal. 2013) (rejecting plaintiff's argument that a conspiracy involving "manufacturers, distributors, and a retailer" was per se unlawful because a manufacturer's agreements with its distributors are vertical agreements, to which per se analysis does not apply). The conspiracy alleged by plaintiff in the FAC simply is not susceptible to per se treatment under controlling law, because of which it must be dismissed. Moreover, because plaintiffs' Cartwright Act claims rise or fall depending on the success of its Sherman Act claim, plaintiffs' Cartwright Act claims must also be dismissed.

**B.     Claim for Interference with Prospective Economic Relations**

Next, the court addresses plaintiffs' state law claim for interference with prospective economic relations. Defendant argues that such a claim requires an underlying violation of law, and that because plaintiffs' antitrust claims must fail, this claim does as well. (Doc. No. 18 at 23.) "[A] plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). Plaintiffs do not dispute this point of law but contend that they have satisfied their burden in this regard by adequately alleging violations of the

Sherman and Cartwright Acts. (Doc. No. 23 at 25.) Because the court disagrees with plaintiff's contention for the reasons discussed above, this claim will also be dismissed.

**C.     Leave to Amend**

In addition to asserting that the FAC should be dismissed, defendant argues that any dismissal should be with prejudice. (Doc. No. 18 at 23–24.) Defendant argues that because plaintiffs have already filed one amended complaint and have failed to state a claim for relief, any further amendment would be futile. (*Id.*)

Federal Rule of Civil Procedure 15 instructs courts to "freely give leave when justice so requires" and that rule is "to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). Nevertheless, leave to amend need not be granted where the amendment:  (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile. *See Amerisource Bergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (citing *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir. 1999)). "Prejudice to the opposing party is the most important factor." *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1387 (9th Cir. 1990) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330–31 (1971)).

Here, the court does not find that granting further leave to amend would be futile. As discussed above, the undersigned has concluded that the FAC is deficient because of the particular legal theory plaintiffs have elected to proceed under, not necessarily due to the insufficiency of the factual allegations as contained within the FAC to state any cognizable claim. Indeed, while the court expresses no opinion on the matter, it is at least conceivable that the conspiracy alleged in the FAC could survive a motion to dismiss if premised on the rule of reason. Accordingly, plaintiffs will be granted twenty-one days from the date of service of this order in which to file a second amended complaint, should they wish to do so.

**CONCLUSION**

For the reasons set forth above,

1.      Defendant's motion to dismiss filed on February 6, 2019 (Doc. No. 18) is granted;

/////

10

2. Plaintiffs' first amended complaint (Doc. No. 14) is dismissed with leave to amend; and

3. Any amended complaint plaintiffs wish to file shall be due within twenty-one days from the date of service of this order.

IT IS SO ORDERED.

Dated: **May 13, 2019**

*/s/ Dale A. Drozd*
UNITED STATES DISTRICT JUDGE